IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | INFORMATION |
| Plaintiff, | ) | |
| v. | ) | CASE NO. **4:20-cr-312** |
| ROBERT ERFORD, JR. | ) | Title 18, United States Code, Section 371 |
| Defendant. | ) | |

The United States Attorney charges:

**GENERAL ALLEGATIONS**

At all times relevant to this Information:

<u>Defendant and Entities</u>

1. Defendant ROBERT ERFORD, JR., was employed as a production mill operator at US Company 1 at a production facility located in Dayton, Texas.

2. US Company 1 was a corporation formed and incorporated in the United States. US Company 1 was a coiled tubing manufacturing business that was owned by US Parent Company, a Houston, Texas-based oilfield products company. Coiled tubing ("CT") was a specialized type of metal tube equipment with many applications in the oil and gas industry, primarily used in the maintenance of underground oil and gas pipes. US Company 1 operated a manufacturing facility in Dayton, Texas, in the Southern District of Texas, and was an industry

leader in the production of advanced forms of CT. In the domestic U.S. and international markets there existed only a few established manufacturing businesses that produced CT. Over many years, US Company 1 had engaged in advanced research and development to produce a specialized and highly developed form of CT that was widely known and in demand in the oil and gas industry ("Advanced CT"). US Company 1 had developed and used a specialized and refined welding technology to create Advanced CT, a product that was able to effectively operate in underground environments that ranged from several thousand feet to five miles in length.

3. US Competitor 1 ("USC 1") was a CT distributor that was associated with Foreign Based Competitor 1, which was an international CT manufacturer operating in the People's Republic of China ("FBC 1"). USC 1 was a Texas corporation that maintained and operated an office and facility in Houston, Texas. USC 1 was associated with FBC 1 and shared common corporate officers. Both USC 1 and FBC 1 were controlled by the same parent corporation which maintained an office in the U.S. and China.

4. Official 1, a PRC national and citizen, was the President of USC 1. Official 1 worked at the USC 1 office in Houston from at least as early as 2018 up to approximately mid-November 2019. Official 2 also was employed at USC 1 and was a USC 1 official.

## COUNT 1

**(Conspiracy under 18 U.S.C. § 371 to Transmit, Buy, and Possess Trade Secrets)**

Between October 2019 to December 2019, in the Southern District of Texas, and elsewhere,

ROBERT ERFORD, JR.

the defendant, together with others known and unknown, did knowingly combine, conspire, confederate, and agree with each other to:

a.	knowingly and without authorization copy, duplicate, download, sketch, draw, alter, photocopy, replicate, transmit, deliver, send, communicate, and convert trade secrets belonging to US Company 1, with the intent to convert such trade secrets relating to a product for or placed in interstate or foreign commerce, for the economic benefit of anyone other than the owner of such trade secrets, and knowing that such actions would injure US Company 1, in violation of 18 U.S.C. § 1832(a)(2); and

b.	knowingly receive, buy, and possess trade secrets belonging to US Company 1, knowing the same to have been stolen, appropriated, obtained and converted without authorization with the intent to convert a trade secret such trade secrets relating to a product or service used in and intended for use in interstate and foreign commerce, to the economic benefit of anyone other than the owner thereof, and intending and knowing that the offense would injure US Company 1, in violation of 18 U.S.C. § 1832(a)(3).

## **OBJECT OF THE CONSPIRACY**

The object of the conspiracy was to provide money and other benefits to an employee of U.S. Company 1 so that he would steal trade secrets from U.S. Company 1 and provide them to USC 1 and FBC 1.

## **MANNER AND MEANS OF THE CONSPIRACY**

5.	Defendant ROBERT ERFORD, JR., and others known and unknown to the Grand Jury, would and did carry out the conspiracy and effect its unlawful objects through, among others, the following manner and means:

a. It was part of the conspiracy that members of the conspiracy associated with USC 1, both known and unknown to the Grand Jury, recruited a US Company 1 employee for the purpose of advancing and developing FBC 1's research, development, and manufacturing capabilities; product technical knowledge; and specific product development with respect to CT technology.

b. It was part of the conspiracy that members of the conspiracy, both known and unknown to the Grand Jury, planned to and did copy, duplicate, download, sketch, draw, alter, photocopy, replicate, transmit, deliver, send, communicate, and convert trade secrets belonging to US Company 1 by accessing information using a then current US Company 1 employee.

c. It was part of the conspiracy that members of the conspiracy, both known and unknown to the Grand Jury, would acquire US Company 1 trade secrets and use the same to promote the business of FBC 1.

d. It was part of the conspiracy that members of the conspiracy, both known and unknown to the Grand Jury, that USC 1 would arrange to provide payments or transfer funds to pay members of the conspiracy and to pay the Defendant's expenses.

e. It was part of the conspiracy that Official 1 and Official 2, and others both known and unknown to the Grand Jury, would coordinate the transfer, receipt and possession of US Company 1 trade secrets for the use and benefit of USC 1 and FBC 1 in the development, production, and marketing of advanced coil tubing technology that were or were to be part of the USC 1 and FBC 1 business.

**OVERT ACTS OF THE CONSPIRACY**

6. On or about April 10, 2019, Defendant ERFORD contacted USC 1 via email inquiring about managerial positions at USC 1. On or about April 10, 2019, Official 1 responded to

ERFORD's email, requesting ERFORD send his resume.

7. On or about April 22, 2019, ERFORD emailed his resume to Official 1.

8. On or about September 30, 2019, Official 1 responded to ERFORD's resume email. Official 1 indicated he was in Houston and asked if ERFORD was interested in meeting. Official 1 sent a follow-up email on or about October 2, 2019, suggesting Official 1 and ERFORD meet on October 4, 2019.

9. During at least three meetings which occurred at USC 1's Houston, Texas facility in October and November 2019, Official 1 expressed to ERFORD a strong interest in US Company 1's Advanced CT product and that he worked with Advanced CT on a daily basis.

10. During their initial meeting in October 2019, Official 1 gave ERFORD a list of questions and problems FBC 1 had experienced manufacturing CT. ERFORD told Official 1 that he could assist with most of FBC 1's issues.

11. During their second meeting on or about October 21, 2019, ERFORD and Official 1 discussed ERFORD traveling to China under a Consultancy Agreement to assist FBC 1 with their CT manufacturing process.

12. Based upon information contained on ERFORD's phone, ERFORD and Official 1 exchanged approximately 208 text messages between October 14, 2019, and November 8, 2019.

13. On October 21, 2019, following their second meeting, ERFORD sent Official 1 the following text message:

> "I really appreciate the chance to meet with you today and also for the opportunity you have offered to me. I'm very interested in doing so. I'm looking forward to keeping in contact with you. If I happen to miss an email from you, I can be reached anytime by text or phone call. Thanks again for your time."

Official 1 responded in kind:

"Hi Robert, I am very happy to meet you today too, thank you for taking my invitation, I will definitely be in touch with you" and "And I will keep you posted once I get any feedback from my plant".

14. October 22, 2019, ERFORD and Official 1 exchanged text messages, wherein Official 1 informs ERFORD:

"…we confirmed to hire you come to China for consulting job (sic)"

"Our CT (coiled tubing) manufacturing plant manager is hoping you can. (sic) stay longer like two weeks, is this possible?"

"And we hope you can come to China ASAP"

Later that day, ERFORD responds affirmatively and ERFORD and Official 1 discuss ERFORD obtaining a Chinese visa and meeting again to talk in more detail about ERFORD's travel:

"Hi Robert, please send me your passport number as soon as you get it, I will have our China plant to send an invitation letter for your Chinese visa application".

15. On or about October 30, 2019, prior to their third meeting, Official 1 emailed ERFORD a Consultancy Agreement. On or about October 31, 2019, ERFORD sent a text message to Official 1 in which ERFORD noted the Agreement listed a different person's name. ERFORD knew the person and expressed concern to Official 1:

> "(Official 1), I recieved (sic) the agreement letter and noticed the other gentleman's name is where mine is suppose (sic) to be, that could be a BIG problem if he knows about me going because I know (Individual 1) personally and he is very good friends with the Head manufacturing manager at (US Company 1) who happens to be my boss." (emphasis original)

> Official 1 responded in succession:

> "S (sic) hi Robert, sorry it's my fault, I forgot to delete that name, to be honest with you, I had been in touch with (Individual 1) as well, but I swear I never mentioned your name to him"
> "You are 100% protected by me"
> "I will never ever tell anybody in US about our communications"
> "Trust me, Robert. I will never let you down"
> "I promise you that nobody in the states will know you had contact with me"

6

> "By the way, I. (sic) will pay your travel, hotels and meals, you can add into the agreement if you like"

Later, on or about October 31, 2019, Official 1 emailed ERFORD another Consultancy Agreement which detailed USC 1's payment for ERFORD's travel to China, including meals and hotel costs.

16. On or about November 5, 2019, amidst discussion on other topics related to ERFORD's travel to China, including payment, Official 1 asks ERFORD:

> "Hi, if you can bring a small piece of sample material of (Advanced CT) I will very appreciate (sic)".

After exchanging a few text messages, ERFORD writes "Already on it" and "Gathering information already".

Official 1 responds, "OK got you, is that possible to get material sample? please be very careful, I don't want to generate any problem on you (sic)".

After ERFORD responds, "Yes its possible", Official 1 writes, "I must protect you".

17. ERFORD, Official 1, and Official 2 met at USC 1's office on or about November 7, 2019. During the meeting, the following exchange took place between ERFORD and Official 1, with Official 2 present:

> Erford: "We're all adults here. This is about (Advanced CT), isn't it?"
> Official 1: Leaning forward, "Yes".
> Erford: "What do you want?"
> Official 1: "Anything and everything you can get."
> Erford: "Ok, I'll do what I can."

During this meeting, ERFORD signed his Consultancy Agreement to assist USC 1 (in effect, FBC 1) in China; received a $1,000 payment from Official 2; and received an Invitation Letter from FBC 1's General Manager. According to the Invitation Letter, ERFORD was invited to FBC 1 "to have (sic) technical exchange and discussion" which

7

"will help us to promoting (sic) our manufacturing efficiency, reduce machine failure and increase production capacity". On November 8, 2019, ERFORD took the Invitation Letter and his US passport to the Chinese visa office for processing.

18. ERFORD's Consultancy Agreement with USC 1, effective November 10, 2019, was for consulting services lasting for 15 days from the date the consultant (ERFORD) arrived at the China (FBC 1) facility. ERFORD was to be paid $1,000 per working day and $500 per travel day during the consulting period. USC 1 was to pay ERFORD for travel, hotel, and meals. The agreement further stated, "The Consultant shall use his outstanding skill and experience to help the Company on all related industry knowledge, including manufacturing process, machinery, inspection, trouble shooting, working schedule management, etc." ERFORD's Consultancy Agreement states that "[t]he Parties agree that Consultant will not reveal the other Party's Confidential Information to anyone outside the Company."

19. On November 8, 2019, in a text message conversation about obtaining a Chinese visa, ERFORD raised concerns over the Chinese consulate contacting US Company 1:

> "When I applied for the visa, they had me put down my current employer, asking for address and phone number. I asked if they had to contact them and I was told no. Are you sure they will NOT contact them?"

> Official 1 guided ERFORD in how to respond to the consulate and US Company 1 if questioned:

> "I am not sure, but maybe you can say you are self employed (sic)"
> "Means you don't have employer, they will not do any investigate (sic)"
> "In the event they call your company, and if your manager ask you, you can say you and your wife like to go to China for a ture (sic)".

20. On December 13, 2019, ERFORD informed the FBI the he had photographed US Company 1's facility from the "front of the mill to the end of the mill" with his cellular phone prior to traveling to China and shortly after returning. ERFORD's cellular phone identified

approximately 120 photos of US Company 1's facility, processes, data, or equipment taken between during October, November, and December 2019. ERFORD communicated with Official 1 to transmit the photographs primarily by the use of WeChat, an encrypted messaging application which Official 1 instructed ERFORD to download. ERFORD sent photographs to Official 1 before, during, and after ERFORD's trip to China; a number of these photographs contained US Company 1's Trade Secrets.

21. On or about November 11, 2019, Official 1 departed the United States for Beijing, China. Thereafter, Official 2 assumed Official 1's position at USC 1.

22. On or about November 22, 2019, ERFORD traveled from Houston, Texas to Beijing, China. USC 1 coordinated and paid for ERFORD's travel, including his flight, hotel, and local transportation.

23. Prior to travelling to China, while at US Company 1' facilities, ERFORD printed a US Company 1 confidential procedural document (Trade Secret #1) critical to the manufacture of Advanced CT. This document contained a warning at the bottom of each page: "This confidential document and the copyright therein are the property of (US Company 1) and may not be used, copied or disclosed to any third party without the prior written authorization of (US Company 1)." ERFORD printed this document containing Trade Secret #1 from a US Company 1 computer, removed Trade Secret #1 from US Company 1's facility without authorization, and transported this document without authorization to provide it to FBC 1 in China.

24. Between November 22 and December 1, 2019, ERFORD visited FBC 1's China office and the CT production facilities for approximately five days. ERFORD met with FBC 1 employees in the presence of Official 1. In response to questions by FBC 1 officers, ERFORD

provided detailed information concerning US Company 1's CT practices and procedures.

25. While in China, ERFORD transferred to Official 1 via WeChat a portion of the photographs taken by ERFORD of US Company 1's facility, processes, data, and equipment. These photographs included schematics of processes and equipment used in the manufacturing of Advanced CT (Trade Secret #2). Trade Secret #2 contained data that represented US Company 1's unique plans and procedures that were not standard practice within the CT industry.

26. US Company 1 had developed certain unique chemical compositions for the raw materials used by US Company 1 to produce, and manufacture Advanced CT, which had been developed through a confidential testing process (Trade Secret #3). ERFORD provided to FBC 1 a number of photographs depicting specific data that described the chemical compositions of material samples reflecting Trade Secret #3 along with physical samples of raw materials used by US Company 1 to produce Advanced CT.

27. FBC 1 officials paid ERFORD approximately $7,500 in cash prior to his departure from China, which payment was approved by the General Manager of FBC 1.

28. On or about November 30, 2019, Official 1 emailed ERFORD a checklist of items and information sought by USC 1 and FBC 1. This checklist consisted of nineteen questions relating to CT production, of which four questions explicitly sought US Company 1's trade secret information. Following his return to work at US Company 1, ERFORD obtained without authorization a range of US Company 1 information that was responsive to the FBC 1 checklist, and transmitted this information via WeChat to Official 1.

29. On or about December 4, 2019, Official 1 instructed ERFORD to delete all messages on WeChat between ERFORD, Official 1, and Official 2.

All in violation of 18 U.S.C. § 371

        Ryan K. Patrick
        United States Attorney

By:  /s/ *S. Mark McIntyre*
        S. Mark McIntyre
        Assistant United State Attorney
        Southern District of Texas

        /s/ *Carolyn Ferko*
        Carolyn Ferko
        Assistant United State Attorney
        Southern District of Texas

        John C. Demers
        Assistant Attorney General

        /s/ *William Mackie*
        William Mackie
        Trial Attorney
        U.S. Department of Justice
        National Security Division
        Counterintelligence & Export Control
        Section